MAY-08-1998 16:21    205 551 0741    P.019/022

**FILED**

98 MAY -8 PM 3: 25

U.S. DISTRICT COURT
N.D. OF ALABAMA

AVA M. FILLMORE, )
)
    Plaintiff, )
)
vs. )    Civil Action No. CV-96-S-1886-S
)
ALABAMA LODGING CORP., d/b/a )
SHONEY'S INNS and SUITES, )
)
    Defendant. )

**ENTERED**

MAY  8 1998

### MEMORANDUM OPINION

Plaintiff Ava M. Fillmore, an African-American female, was employed by defendant — initially as a front desk clerk and later as front desk manager — at its "Shoney's Inn" motel in Homewood, Alabama, from an unknown date during December of 1994 until December 20, 1995. Fillmore alleges she was denied equal pay and raises because of her race and gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., 42 U.S.C. § 1981, and the Equal Pay Act, 29 U.S.C. § 206(d)(1). She also alleges she was terminated because of her gender in violation of Title VII. Plaintiff commenced this action on July 23, 1996. The case now is before the court on defendant's motion for summary judgment.

### I. SUMMARY OF FACTS

Defendant, Alabama Lodging Corporation, is an Alabama corporation licensed to do business as "Shoney's Inn and Suites." It owns or operates approximately 85 hotels and motels throughout the United States. (Answer ¶ 3; Gwin Deposition at 73.) Defendant



opened a new Shoney's Inn in Homewood, Alabama during December of 1994. (Gwin Deposition 19.) The hotel employed one general manager, Mary Beth Harrison, one assistant general manager, Christopher Hampton, and numerous other persons working as front desk clerks, housekeepers, security guards, and maintenance employees.

Ava Fillmore was hired in December of 1994 as a front desk clerk by general manager Mary Beth Harrison, a white female. (Complaint at 2; Fillmore Deposition at 36.) That position required plaintiff to be responsible for customer registration, wake-up calls, reservations, balancing cash receipts for her shift, and reviewing the in-house guest list. (Fillmore Deposition at 37.) Her beginning hourly wage was $5.75, but her pay was increased to $6.00 an hour at the end of a 90-day probationary period. (*Id.* at 87.)

General Manager Harrison's employment was terminated several months later. Assistant general manager Christopher Hampton, a white male, was named acting general manager. (Gwin Deposition at 19.) He served in that capacity until April 1, 1995, when Phyllis Gwin, a white female, was hired as permanent general manager. (*Id.* at 19.) Hampton then returned to the assistant general manager position for the remainder of the time he worked at defendant's Homewood motel.

## A. Plaintiff's Promotion

Christopher Hampton accepted a promotion to general manager of

2

a Shoney's Inn located in Bossier City, Louisiana during June of 1995. (Gwin Deposition at 32-33, 63-64.) The assistant general manager position vacated by Hampton was not immediately filled. Shortly after Hampton's departure plaintiff was offered the newly-created position of "front desk manager" by general manager Phyllis Gwin. (Fillmore Deposition at 46, 49.) Plaintiff asked why Hampton's former position was not being filled, and Gwin allegedly said "the job had been eliminated because corporate felt that [the Homewood] hotel did not need [both] an assistant and a general manager." (Id. at 83-84.) Fillmore accepted the promotion offered to her. Her hourly wage was increased to $7.00, and she began performing the duties of front desk manager on July 17, 1995. (Id. at 46; Gwin Deposition at 100-01.)

That position required Fillmore to be responsible for training all front desk clerks and setting their daily work schedules to ensure 24-hour coverage for the hotel's front desk. (Fillmore Deposition 52.) Front desk clerks worked one of three shifts: 7:00 a.m. to 3:00 p.m.; 3:00 p.m. to 11:00 p.m.; or 11:00 p.m. to 7:00 a.m. The front desk clerk assigned to the night shift beginning at 11:00 p.m. was called the "night auditor," and ran daily reports listing all transactions between the hotel and its guests. (Gwin Deposition at 38.) If a particular shift was not covered by the employee assigned to that shift, Ava Fillmore was responsible for finding another clerk to cover the front desk, or covering it herself. (Fillmore Deposition at 59.) Fillmore

generally scheduled herself to work the front desk during the first (7:00 a.m. to 3:00 p.m.) shift, Monday through Friday. (*Id.*) Although Fillmore did not possess authority to hire new clerks, she did exercise authority to fire front desk clerks. (*Id.* at 67.) Additionally, Fillmore produced weekly forecasts of hotel sales, and she was designated manager on duty whenever both the general manager and sales manager were out of the office. (*Id.* at 67, 82.)

In contrast, the duties of the assistant general manager at the time Christopher Hampton occupied the position were significantly greater than Ava Fillmore's responsibilities as front desk manager and included: supervising all areas of the hotel; assuming authority over all departments; interviewing all potential staff employees; hiring and firing all staff employees; acting as manager on duty in the general manager's absence; maintaining a 90-day sales forecast for the corporate home office; handling accounts receivable; scheduling front desk clerks; training front desk clerks; maintaining corporate communications from the night audit shift; covering a front desk shift in emergencies; preparing and making bank deposits; ordering front desk supplies; and maintaining guest supplies. (Fillmore Deposition 39-46; Gwin Deposition 52-53.) Plaintiff does not dispute that Hampton fulfilled each of those responsibilities while serving as assistant general manager.

## B. Plaintiff's Second Job

Plaintiff requested a pay raise on at least three occasions following her promotion to front desk manager. Her request was

4

denied each time.  The first request was made on or about August 21, 1995.  Gwin told Fillmore "she would see what she [c]ould do and she would get back with me."   (Complaint ¶ 6; Fillmore Deposition at 89.)  Gwin did not, however, "get back" to Fillmore. (Fillmore Deposition at 89.)  In October, Fillmore told Gwin that, unless she received a raise, she would have to seek part-time employment to supplement her income.  (*Id.* at 91, 93.)  Fillmore reassured Gwin that "it did not mean that I was trying to leave Shoney's Inn, I was just seeking a second job."  (*Id.* at 91.)  Gwin voiced no objection to Fillmore's plan, although she contends that she asked to be informed of plaintiff's work schedule, to insure that her duties as front desk manager would not be neglected. Fillmore denies that Gwin mentioned the possibility of schedule conflicts to her.[1]  (*Id.* at 95.)

In late October of 1995, plaintiff accepted a part-time job as front desk clerk at the "Best Suites" motel in Homewood.  (Fillmore Deposition at 97; Complaint ¶ 6.)  Fillmore did not tell Gwin about her new job at that time.  (*Id.* at 97-98.)  On or around November 16, 1995, Fillmore again requested a pay increase from Gwin. (Complaint ¶ 6.)  Gwin denied the request.  (*Id.*)

Gwin first learned of Fillmore's part-time job at the Best Suites motel during the weekend of December 15-17, 1995.

---

[1] Another point also is disputed.  Gwin asserts she told plaintiff to let her know where she intended to work before accepting a second job.  Fillmore disputes that contention.  Nevertheless, on a motion for summary judgment, the facts must be construed in the light most favorable to the non-moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

5

(Complaint ¶ 7.) She told Fillmore that a part-time job at another hotel created a conflict of interest. Fillmore offered to quit her Best Suites job, if Gwin would grant her a pay increase. (Fillmore Deposition at 97.) Gwin again denied the request. (*Id.*)

## C. Plaintiff's Termination

Plaintiff was terminated following a series of events that occurred during the weekend of December 15-17, 1995. Shortly before 11:00 p.m. on Friday, December 15th, front desk clerk Delphine Taylor called plaintiff at home. (Complaint ¶ 7.) Taylor reported that Sunta Adams, who was scheduled to work the night auditor shift beginning at 11:00 p.m., had not reported for duty. (*Id.*) During that phone call, however, Shana Jarrett, an off-duty front desk clerk, fortuitously walked into the hotel to collect her paycheck. (Jarrett Deposition at 12-13.) Fillmore spoke with Jarrett, who volunteered to work Adams' shift that night. (Jarrett Deposition at 15, 28.) Fillmore testified that Jarrett also volunteered to cover Adams' shift the following Saturday night, in the event Adams still did not report for duty. (Fillmore Deposition at 161-62.) Fillmore paged Gwin to report the situation, but Gwin did not return the call. (Fillmore Affidavit at 2.)

Sometime after midnight during the early morning hours of Saturday, December 16, Phyllis Gwin arrived at the hotel. (Jarrett Deposition at 14.) It is not clear from the record whether Gwin did so in response to Fillmore's earlier page, or for

6

some other reason. In any event, Gwin sent Jarrett home, completed the night audit, and worked the remainder of the shift. (Jarrett Deposition at 26.) Gwin also worked the Saturday night to Sunday morning night auditor shift, when Sunta Adams still did not report for duty. (Fillmore Deposition at 163-64.)

On the morning of Saturday, December 16th, Jarret telephoned plaintiff to tell her that she would not work the Saturday night auditor shift as planned due to an altercation she had with Gwin that morning. (*Id.* at 164.) Plaintiff then called Gwin, and told her that she, too, was unable to work the Saturday night auditor shift, because she did not have a baby-sitter for her children. Gwin agreed to cover the shift. (*Id.* at 165-66.) Plaintiff testified that, later that same day, "I was called by Ms. Gwin while working at my part-time job at Best Suites. She asked me what I was doing at Best Suites and that she would have to talk to me about 'that.'" (Fillmore Affidavit at 2; *see also* Fillmore Deposition at 173.)

Plaintiff was scheduled to work the 7:00 a.m. to 3:00 p.m. shift at Shoney's Inn on Sunday, December 17, 1995. Shortly after arriving, however, she was called away to handle an alleged "family emergency." (Fillmore Deposition at 173-74; Fillmore Affidavit at 2.) She called Gwin, who again agreed to cover the shift for plaintiff. (Fillmore Deposition at 174.) Gwin later telephoned plaintiff at home, telling her to bring a doctor's excuse when she returned to work. Plaintiff replied that the "emergency" was not

7

medical in nature, but she refused to tell Gwin the precise nature of the "family emergency." (*Id.* at 181.) Plaintiff contends that Gwin then told her not to report to work the next day. (Fillmore Affidavit at 2.) It apparently was during this conversation that plaintiff also made her final request for a pay raise: "I explained to her that I was working the part-time job because I needed a raise." (*Id.*)

The following day,[2] plaintiff asked Gwin which shift she would be working upon her return to work. Gwin responded that "I had been terminated because I did not like my job and I did not cover the night auditor shift on December 15, 1995." (*Id.*) At plaintiff's request, Gwin memorialized the termination by letter dated December 20, 1995.

> While employed as Front Desk Manager, Ava Fillmore took a part time position at a competit[or's] hotel. This was done without the knowledge or approval of management of the Shoney's Inn. As a result of this part time position the hotel was left without a night auditor on Friday, Dec. 15th. Ms. Fillmore did not call to check if the shift on Dec. 15th or Dec. 16th was covered.
>
> Ms. Fillmore's position was terminated as a result of these actions.

(Plaintiff's Exhibit L.)

## II. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

---

[2] The precise date on which this conversation occurred is unclear from the record before the court.

8

no genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of. law." "An issue of fact is
'material' if it is a legal element of the claim under the
applicable substantive law which might affect the outcome of the
case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.
1997)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248,
106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). "It is 'genuine' if
the record taken as a whole could lead a rational trier of fact to
find for the nonmoving party." *Id.*

The moving party has the initial burden of showing the absence
of a genuine issue as to any material fact. *Id.* In determining
whether this burden is met, the court must view the evidence "and
all factual inferences arising from it in the light most favorable
to the nonmoving party." *Id.* (quoting *Adickes v. S.H. Kress & Co.*,
398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)).

Once the movant's initial burden is met, "the burden shifts to
the nonmovant to 'come forward with specific facts showing that
there is a genuine issue for trial.'" *Id.* (quoting *Matsushita
Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587,
106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). In meeting its
burden, "the nonmoving party may avail itself of all facts and
justifiable inferences in the record taken as a whole." *Tipton v.
Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992)(citing
*United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993,
994, 8 L.Ed.2d 176 (1962)).

9

" 'The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tipton*, 965 F.2d at 999 (quoting *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513). Even so, a "mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)(citing *Anderson*, 477 U.S. at 242, 106 S.Ct. 2505). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356 (citation omitted).

Defendant challenges plaintiff's claims on several grounds. First, defendant asserts that plaintiff presents no direct evidence of intentional discrimination. Second, defendant argues that plaintiff presents insufficient circumstantial evidence of discrimination. Third, defendant avers that, even if the court determines that plaintiff has made out a *prima facie* case, she has failed to prove that defendant's stated, non-discriminatory reason for her termination is pretextual. Fourth, defendant contends that plaintiff's Equal Pay Act claim must fail because she has not shown that her job was "substantially similar" to her higher-paid male comparator.

### III. TITLE VII AND § 1981 CLAIMS

Title VII provides that "[i]t shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to

10

discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin;..." 42 U.S.C. § 2000e-2(a). "When § 1981 is used as a basis for relief parallel to that provided by Title VII, the elements of a § 1981 claim are identical to the elements of a Title VII claim." *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980); *accord Walters v. City of Atlanta*, 803 F.2d 1135, 1143 (11th Cir. 1986). Accordingly, this court analyzes plaintiff's Title VII and § 1981 claims together.[3]

To prevail on her Title VII claims, plaintiff must prove that her employer intended to discriminate against her. *See, e.g., Kelly v. Boeing Petroleum Services, Inc.*, 61 F.3d 350, 357 (5th Cir. 1995). The evaluation of plaintiff's evidence of intent differs depending upon whether plaintiff's proof is direct or circumstantial in nature.

"When there is direct evidence that discrimination was a motivating factor in the challenged employment decision, the appropriate analysis is different from that employed in a case where only circumstantial evidence is available." *Trotter v. Board of Trustees of the University of Alabama*, 91 F.3d 1449, 1453 (11th Cir. 1996)(citing *Bell v. Birmingham Linen Service*, 715 F.2d 1552,

---

[3] *Nota bene,* however, that § 1981 applies only to plaintiff's race-based claims. The statute does not apply to discrimination based upon sex. *See* 42 U.S.C. § 1981.

11

1556 (11th Cir. 1983); *Haynes v. W.C. Caye and Co., Inc.*, 52 F.3d 928, 931 (11th Cir. 1995)). "Statements indicating ... bias on the part of a decisionmaker in an employment setting can constitute direct evidence of ... discrimination in Title VII cases." *Trotter*, 91 F.3d at 1453 (emphasis supplied)(citations omitted). Statements of decisionmakers directly related to the decisional process are direct evidence of discrimination. *See, e.g., Bell v. Birmingham Linen Service*, 715 F.2d 1552 (11th Cir. 1983)(plaintiff's supervisor made a direct statement of bias when rejecting plaintiff for promotion), *cert. denied*, 467 U.S. 1204 (1984). Even so, "[o]nly the most blatant remarks, whose intent could only be to discriminate on the basis of [an impermissible factor] constitute direct evidence." *Coats v. Coats & Clark, Inc.*, 990 F.2d 1217, 1226 (11th Cir. 1992).

When a plaintiff establishes by direct evidence that a contested employment decision was motivated by a discriminatory animus, the employer "may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's gender [or race] into account." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S.Ct. 1775, 1795, 104 L.Ed.2d 268 (1989)(emphasis supplied). In other words, "defendant must prove that there was a separate, racially [or gender] neutral [*i.e.*, non-discriminatory] reason for its" contested employment decision. *E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920, 925 (11th Cir. 1990)(emphasis

12

supplied).

Normally, however, a plaintiff does not possess direct evidence of the employer's motive. "There will seldom be 'eyewitness' testimony as to the employer's mental processes." *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 1482 (1983).

Nevertheless, discriminatory intent sometimes can be inferred from circumstantial evidence. When a plaintiff relies on circumstantial evidence to prove a charge of unlawful discrimination, the evaluation of that proof occurs within a tripartite framework developed by the Supreme Court in a trilogy of decisions: *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); and *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). *See also United States v. Crosby*, 59 F.3d 1133, 1135 (11th Cir. 1995). First, plaintiff's presentation of evidence establishing a *prima facie* case "creates a rebuttable presumption of unlawful discrimination." *Crosby*, 59 F.3d at 1135 (quoting *Armstrong v. Flowers Hospital, Inc.*, 33 F.3d 1308, 1313-14 (11th Cir. 1994). "Next, the defendant may rebut the presumption established by the *prima facie* case by articulating a nondiscriminatory reason for its actions.'" *Id.* (citation omitted). Finally, if the defendant satisfies its burden of articulating a nondiscriminatory reason for its actions, the

13

presumption of discrimination raised by a *prima facie* case "simply drops out of the picture," and the sole inquiry becomes whether the plaintiff has proven intentional discrimination. *Id.* (quoting *St. Mary's*, 509 U.S. at 511, 113 S.Ct. at 2749, 125 L.Ed.2d 407). Evidence that similarly situated employees were treated differently is of probative value, but does not always establish that intentional discrimination occurred. *Id.*

## A.    Discrimination Based Upon Race

Plaintiff's race-based wage discrimination claims are grounded on the following allegations:  she was paid less than a white male employee performing similar work; and, she was denied raises outside her anniversary date, whereas a similarly-situated white female employee received raises.

### 1.    Wage discrimination

Plaintiff proffers both direct and circumstantial evidence in support of her claim of race-based wage discrimination. First, she contends she "overheard Gwin make comments about how much she enjoyed staying in a hotel which had an all-white staff." (Fillmore Deposition at 283.)    Gwin allegedly referred in plaintiff's presence to an African-American police officer as "being so black, he was blue." (*Id.* at 286.)  Gwin also allegedly barred the African-American housekeeping staff from the area behind the front desk, referring to them as "those people." (*Id.* at 288.) Plaintiff asserts those remarks constitute direct evidence of racial animus.

14

Title VII liability attaches only to an "employer": a word
Congress defined as "a person engaged in an industry affecting
commerce ... and any agent of such a person." 42 U.S.C. § 2000e(b)
(emphasis supplied). Generally, the phrase "any agent" is accorded
a liberal construction. *See Garcia v. Elf Atochem North America*,
28 F.3d 446, 451 (5th Cir. 1994). Under such a construction,
supervisory personnel are considered "employers" when they are
delegated traditional rights of the employer, such as the power to
hire and fire employees. Thus, the Eleventh Circuit includes
supervisors within the definition of "employer," but only if the
supervisor is delegated final authority to make employment
decisions. *See, e.g., Goldsmith v. City of Atmore*, 996 F.2d 1155,
1162 (11th Cir. 1993)(mayor deemed "employer" when "City had
delegated final authority to Mayor ... to make employment decisions
within the City Clerk's office"); *Williams v. City of Montgomery*,
742 F.2d 586, 589 (11th Cir. 1984)("'Where the employer has
delegated control of the employer's traditional rights, such as
hiring or firing, to a third party, the third party has been found
to    be    an    'employer'    by    virtue    of    the    agency
relationship.'"(citations omitted)).

In like manner, the Fifth Circuit construes the term
"employer" as including supervisors, but only when they
"participated in the decision-making process that forms the basis
of the discrimination." *Hamilton v. Rodgers*, 791 F.2d 439, 443
(5th Cir. 1986)(citations omitted); *see also, e.g., Harvey v.*

15

*Blake,* 913 F.2d 226, 227 (5th Cir. 1990)("immediate supervisors are Employers when delegated the employer's traditional rights, such as hiring and firing"). The Fourth Circuit also held a supervisory employee to be an employer, but again only when he had "significant input into such personnel decisions [*i.e.,* hiring and firing]." *Paroline v. Unisys Corporation,* 879 F.2d 100, 104 (4th Cir. 1989).

Here, Phyllis Gwin was given authority to hire and fire employees, and to establish wage rates at defendant's Homewood hotel. Although Gwin allegedly consulted with David McIndoo, the company's district manager, about such decisions, Gwin clearly had significant input into all personnel matters at the hotel she managed. McIndoo himself made none of the decisions at issue in this lawsuit; Gwin made them with input from McIndoo. Moreover, only Gwin, plaintiff's direct supervisor, is alleged to have made the racially offensive remarks. Accordingly, the court finds Gwin was an agent of plaintiff's employer at all times relevant to this lawsuit.

In Justice O'Connor's concurring opinion in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 1804-05, 104 L.Ed.2d 268 (1989), she noted that

> stray remarks in the workplace ... cannot justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria. Nor can statements by nondecisionmakers, or <u>statements by decisionmakers unrelated to the decisional process itself,</u> suffice to satisfy the plaintiff's burden in this regard.

(emphasis supplied). Thus, the remarks alleged to reveal Gwin's

16

(*i.e.*, the "employer's") discriminatory animus must be related to the adverse employment action complained of. "[D]irect evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude <u>correlating</u> to the discrimination or retaliation complained of by the employee." *Caban-Wheeler v. Elsea,* 904 F.2d 1549, 1555 (11th Cir. 1990)(emphasis supplied).

This court has reviewed the evidence plaintiff contends is direct evidence of racial discrimination and finds no correlation between those alleged remarks and any wage disparity. Indeed, when asked at her deposition, plaintiff was unable to recall even the approximate date on which the remarks were made. Absent any correlation, temporal or otherwise, between the discriminatory attitude reflected by Gwin's alleged statements and the disparate treatment complained of, the evidence cannot be considered "direct," and the court should not impose a direct evidence burden on defendant. *Caban-Wheeler,* 904 F.2d at 1555. Accordingly, the court finds no direct evidence of race-based discrimination.

Plaintiff's circumstantial case for race-based wage discrimination rests upon the assertion that she worked the same job, but was paid less than a white male, Christopher Hampton. "To establish a *prima facie* case of racial discrimination with respect to compensation, the plaintiff must show that [s]he was paid less than a member of a different race was paid for work requiring substantially the same responsibility." *Pittman v. Hattiesburg*

17

*Municipal Separate School District*, 644 F.2d 1071, 1074 (5th Cir. May 13, 1981)⁴; *see also Blount v. Alabama Co-operative Extension Service*, 869 F. Supp. 1543, 1550 (M.D. Ala. 1994)(Plaintiff establishes a *prima facie* case of race-based wage discrimination under Title VII by demonstrating that she is an African American and she occupies a position similar to employees who are white who are compensated at a higher rate than she).

The Eleventh Circuit holds that Title VII requires a "relaxed standard of similarity" between the jobs being compared, in contrast to the more rigorous standard applicable to a wage discrimination claim founded on the Equal Pay Act discussed later in this opinion. *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518 (11th Cir. 1992). Even so, the court finds that plaintiff has not demonstrated that the duties of front desk manager were the same as, or even remotely similar to, the responsibilities of assistant general manager. As noted in the discussion on pages 3-4 *supra*, the two jobs differ in substantial and significant ways. As front desk manager, plaintiff's area of responsibility was limited to the front desk. She supervised, trained, and scheduled approximately four front desk employees. Significantly, she also was required to work the front desk herself for four shifts, or 32 hours, every week. While working, plaintiff was required to wear the same uniform of a front desk clerk. By comparison, Hampton supervised all hotel employees and operations, including the front

---

⁴ In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

18

desk, maintenance, housekeeping, security, and sales staff. He was required to work a minimum of 48 hours per week, yet he was neither required nor expected to spend any of those hours working the front desk unless an emergency demanded that he do so. Hampton was expected to be professionally dressed, but was not required to wear a uniform. Moreover, Hampton interviewed, hired, and fired employees in every department of hotel operations. Plaintiff apparently had authority to fire front desk clerks, but she had no such authority over any other hotel employees. Nor was she permitted to interview or hire employees, even those who were to work at the front desk under her supervision. Thus, plaintiff is unable to demonstrate a *prima facie* case of race-based wage discrimination between the salary paid the assistant general manager and front desk manager.

## 2. Denial of pay increases

Plaintiff asserts disparate treatment based upon race in the denial of her requests for a pay increase. To prove that claim, plaintiff must demonstrate "that nonminority, similarly situated employees were treated more favorably." *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1313 (11th Cir. 1998). Plaintiff asserts that she was denied pay raises for the stated reason that corporate policy prohibited raises except on the anniversary of her hire date. She alleges that a white employee was given raises in violation of that policy.

Kelly Headley, a white female, was hired by Phyllis Gwin as a

19

night auditor in September of 1995. The normal beginning wage for that position is $6.00 an hour, $.25 more than the starting wage for daytime front desk clerks. Headley, however, was offered $6.25 an hour. (Gwin Deposition 107, 109, 112, 199.) In contrast, Darrell Gaithers, a black male already employed as a night auditor at the time Kelly Headley was hired, was paid $6.00 per hour. Gwin testified that Headley was paid a higher starting wage because the night audit position was difficult to fill, and the hotel had "gone a period of time without an auditor. And she, basically, if I remember correctly, had a little more history, background, than Mr. Gaithers had." (Id. at 107, 109.)

At the end of her 90-day probationary period, Headley received a $.25 an hour raise, as did plaintiff and other Shoney's employees who received a satisfactory probationary review. However, on March 25, 1996 — six months before the anniversary of her hire date — Headley received yet another pay increase of $.25 an hour, bringing her hourly wage to $6.75. (Id. at 199-200.)

Those facts are sufficient to establish a prima facie case of disparate treatment. Thus, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for approving Headley's request for a raise, yet denying plaintiff's request.

Gwin testified that Headley was given the raise because she threatened to quit and "I did not have anyone else I could fill that position with quickly ... [a]nd it was in the best interest of the hotel to do that." (Id. at 201.) On the other hand, Gwin

20

testified that the company was unwilling to increase plaintiff's salary any more because she recently had received a $1.00 per hour raise upon her promotion to front desk manager. (*Id.* at 201-02.) Significantly, that pay increase occurred outside of plaintiff's anniversary date, just as Headley's did. Plaintiff's own pay increase thus demonstrates that Shoney's sometimes violated its policy of approving raises for both white and black employees. Those reasons are sufficient to rebut plaintiff's *prima facie* case. *See Perryman v. Johnson Products, Inc.*, 698 F.2d 1138 (11th Cir. 1983)(defendant's burden of production in rebutting the *prima facie* case is "exceedingly light").

Plaintiff attempts to demonstrate pretext by arguing that she also threatened to quit if she did not receive a pay raise. No such explicit threat appears in the record. To the contrary, plaintiff reassured Gwin that her plan to add a part-time job "did not mean that I was trying to leave Shoney's Inn, I was just seeking a second job." (Fillmore Deposition at 91.) Nevertheless, plaintiff also may demonstrate pretext by presenting direct evidence of a decisionmaker's discriminatory animus. *Miles v. M.N.C. Corporation*, 750 F.2d 867, 870 (11th Cir. 1985)(plaintiff may prove pretext with "direct evidence of discrimination, in the form of discriminatory statements and admissions").

Here, plaintiff has presented evidence that Gwin allegedly made statements which, if proven to be true, demonstrate racial animus. Gwin later denied plaintiff's requests for pay increases

21

while granting similar requests from Headley, a white employee. Indeed, Gwin apparently went to great lengths — even violating company policy — to insure that Headley did not quit, because Headley claimed she "needed more money." Yet Gwin appears to have turned a deaf ear to plaintiff's similar request for more money on at least three occasions. Those facts, together with Gwin's alleged preference for an "all-white" staff and other statements indicative of a racial bias, constitute sufficient evidence of pretext to rebut defendant's articulated reason for its favorable treatment of Headley. Accordingly, as to plaintiff's claim of discriminatory pay increases based upon race, defendant's motion for summary judgment is due to be denied.

### 3. Discriminatory discharge

The complaint asserts discrimination relating to plaintiff's discharge based upon both gender and race. Yet, the following exchange is recorded in plaintiff's deposition:

    Q.   Paragraph nine in your complaint says white employees in similar situations have not ... been treated in the same manner; nor have they been discriminated against for the same type of infractions or policy that plaintiff denies committing. Do you know what that's referring to?

    A.   It's referring to the incident that happened with the shift not being covered or -- and also that there were other employees that worked at another hotel, and they weren't terminated because of it.

    Q.   Would one of those be Mr. Darrell Gaithers that you reference in paragraph ten of your complaint?

    A.   Yes.

    Q.   Mr. Gaithers is black?

22

A.   Yes, he is.

Q.   So at least as you allege it in the complaint, the
     discrimination you allege you incurred there <u>was
     based solely on your sex</u>, <u>not race</u>?

A.   <u>Correct</u>.

. . .

Q.   So your claim for discrimination as it relates to
     the other job issue is <u>based upon your sex,
     correct</u>?

A.   <u>Correct</u>.

(Fillmore Deposition at 201-02 (emphasis supplied).)   Plaintiff

thus plainly concedes that she presents no claim for discriminatory

discharge based upon race.

     Even absent that concession, plaintiff has not presented

sufficient evidence to establish a *prima facie* case of

discriminatory discharge based upon race.[5]  The Eleventh Circuit

has consistently held that a plaintiff fired for alleged misconduct

> makes out a prima facie case of discriminatory discharge
> if [s]he shows that [s]he is a member of a protected
> class, that [s]he was qualified for the job from which
> [s]he was fired, and "that the misconduct for which [she]
> was discharged was <u>nearly identical</u> to that engaged in by
> [an employee outside the protected class] whom [the
> employer] retained."

*Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th

Cir. 1984)(quoting *Davin v. Delta Air Lines, Inc.*, 678 F.2d 567,

---

[5] Plaintiff argues in brief as though the claim survives, yet she produces
no evidence of a non-minority comparator upon which to base such a claim.  Nor
does she attempt to explain how her deposition testimony can be construed as
anything but a concession of any race-based claim arising from her termination.

23

570 (5th Cir. Unit B June 14, 1982)(emphasis added)[6]; *accord McDonald v. Sante Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976)(holding that employer would violate Title VII if it fired black employees who participated in theft of cargo while retaining equally guilty white employees); *Green v. Armstrong Rubber Co.*, 612 F.2d 967, 968 (5th Cir.),[7] *cert. denied*, 449 U.S. 879, 101 S.Ct. 227, 66 L.Ed.2d 102 (1980)(plaintiff must demonstrate by a preponderence of the evidence either that she did not violate a work rule or that, if she did, white employees who engaged in similar acts were not punished similarly").

Plaintiff has not presented any evidence of a non-minority employee who was disciplined differently for similar infractions. Accordingly, even if plaintiff had not conceded the issue, her claim for discriminatory discharge based upon race must fail.

## B.   Discrimination Based Upon Gender

Two factual allegations underlie plaintiff's Title VII claims of gender-based discrimination: she alleges that she was paid a lower wage than a male employee, Christopher Hampton, for performing the same, or similar, job duties; and, she alleges that she was fired for working a part-time job at another hotel, yet a male employee was allowed to hold such a job without being fired.

---

[6] In Stein v. Reynolds Securities, Inc., 667 F.2d 33, 34 (11th Cir. 1982), the Eleventh Circuit adopted as binding precedent all decisions of Unit B of the former Fifth Circuit handed down after September 30, 1981.

[7] *See* note 4 *supra*.

24

## 1.      Wage discrimination

Plaintiff asserts only circumstantial evidence in support of her gender-based claim of unequal pay. Plaintiff may establish a *prima facie* case of gender-based wage discrimination in violation of Title VII "by demonstrating that she is female and that the job she occupied was similar to higher paying jobs occupied by males." *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1529 (11th Cir. 1992). This claim rests upon the same factual averments as plaintiff's race-based wage disparity claim, discussed above. As already explained, plaintiff has not demonstrated that the jobs of assistant general manager and front desk manager are similar, and this court found that the jobs differ substantially in both daily duties and levels of responsibility. For those reasons, plaintiff cannot establish a *prima facie* case of gender-based wage discrimination.

## 2.      Discriminatory discharge

Plaintiff alleges that Darrell Gaithers, an Afircan-American male night auditor, was permitted to hold a part-time job at another hotel without objection. Gaithers is plaintiff's only alleged comparator. This claim proceeds within the same framework as the race-based discharge claim previously discussed.

In addition to proving "that the misconduct for which [she] was discharged was nearly identical to that engaged in by [a male employee] whom [the employer] retained," *see Nix*, 738 F.2d at 1185, plaintiff must show that the other employee

25

> with whom [plaintiff] seeks to compare [her] conduct ...
> dealt with the same supervisor, [was] subjected to the
> same standards and ... engaged in the same conduct
> without such different or mitigating circumstances that
> would distinguish their conduct or the employer's
> treatment of them for it.

*Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (8th Cir. 1988).

Plaintiff's discriminatory discharge claim founders because she fails to demonstrate that Gaithers engaged in misconduct "nearly identical" to that attributed to her. Plaintiff was not discharged solely because she "took a part time position at a competit[or's] hotel," allegedly "without the knowledge or approval of management of the Shoney's Inn," but also because "[a]s a result of this part time position the hotel was left without a night auditor on Friday, Dec. 15th," and, "Ms. Fillmore did not call to check if the shift on Dec. 15th or Dec. 16th was covered." (Plaintiff's Exhibit L.) Gaithers, a night audit desk clerk, had no similar managerial responsibilities, nor does plaintiff allege that he neglected any duties assigned to him. Moreover, Gaithers and Fillmore did not share the same supervisor: Fillmore supervised Gaithers, and Gwin supervised Fillmore.

Even accepting Fillmore's interpretation of the reason for her discharge (*i.e.*, merely that she held a part-time job at a competitor's hotel without the knowledge or approval of Shoney's management), she has not demonstrated that Shoney's management similarly was unaware of Gaithers' part-time job. Indeed, it is undisputed that Shoney's management knew of Gaithers' other job when he was hired. (Gwin Deposition at 223-24.)

26

Additionally, plaintiff admits that she refused to disclose to Gwin the precise reason for her absence from work on December 17, 1995. When asked, she merely stated she had a "family emergency," offering no further justification for her absence. That act of insubordination alone is a mitigating circumstance which sufficiently distinguishes defendant's treatment of Gaithers from its treatment of Fillmore. Accordingly, plaintiff's claim of discriminatory discharge based upon sex is due to be dismissed.

## IV. EQUAL PAY ACT CLAIM

The Equal Pay Act, 26 U.S.C. § 206(d)(1), is an amendment to the Fair Labor Standards Act of 1938. The Act is "directed only at wage discrimination between the sexes and forbids the specific practice of paying unequal wages for equal work to employees of the opposite sex." *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1526 (11th Cir. 1992).

A *prima facie* case of an EPA violation is shown if an employer "pays different wages to employees of opposite sexes 'for equal work on jobs ... [requiring] equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974)(quoting 29 U.S.C. § 206(d)(1)); *Mitchell v. Jefferson County Board of Education*, 936 F.2d 539, 547 (11th Cir. 1991). Once a *prima facie* case is demonstrated, the burden shifts to the defendant to prove that the differential is justified by one of four exceptions set forth in

27

the EPA:  "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex."  29 U.S.C. § 206(d)(1).

Here, plaintiff has failed to establish a *prima facie* case because she cannot demonstrate that her comparator, Christopher Hampton, performed substantially equal work.  "The standard for determining whether jobs are equal in terms of skill, effort, and responsibility is high."  *Waters v. Turner, Wood & Smith Insurance Agency, Inc.*, 874 F.2d 797, 799 (11th Cir. 1989).  Given this court's finding that plaintiff has not met even the "relaxed" standard of similarity required to support a Title VII wage discrimination claim, the court finds that plaintiff also has failed to meet the higher burden required by the EPA.  Accordingly, plaintiff's EPA claim is due to be dismissed.

## V.  CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is due to be granted in part and denied in part.  An order consistent with this memorandum opinion shall be entered contemporaneously herewith.

DONE this __8th__ day of May, 1998.

_____
United States District Judge

28